Mr. Quickstein, we'll start with you. I understand you're saving 5 minutes for rebuttal, is that right? Yes, with the court's permission, we'd like to save 5 minutes. And before I begin, is the audio coming through clear? Yes. Yes, I think everybody's indicated they can hear you. Very good, thank you. Thank you, Your Honor, and may it please the Court. We discussed several constitutional claims in our briefing, but I want to start today with the narrowest and I think the most straightforward reason that plaintiffs are entitled to relief, and that is our 26th Amendment claim as applied in the Constitution. A 65-year-old with a heart condition is ordinarily required to vote in person if they want to cast a ballot in the upcoming general election. But a 65-year-old identically situated, even a 65-year-old who doesn't have any health condition, is entitled to cast a ballot by mail without offering any excuse. And in a pandemic in which in-person voting exposes all voters to the risk of contracting a serious and potentially deadly virus, that at a minimum is an abridgment of the 55-year-old's right to vote on account of age, as the restriction is applied in this context. The same thing is true of a 45-year-old who may live with elderly parents and not want to vote in person because she doesn't want to expose them to the risk of contracting COVID, or a 30-year-old who has a child with a respiratory condition. All voters under the age of 65 are required to trade off their rights to health and safety and the rights of their loved ones and family against the ability to cast a vote in November. And under Indiana's scheme, that is a trade-off that no 65-year-old or older voter is required to make. Defendants themselves recognize that COVID-19 poses significant burdens on the right to vote because they chose in the June primary just a few months ago to allow everyone, regardless of age, the ability to cast a ballot in the primary election. And they do not and cannot dispute that that burden now falls only on those under 65 as a result of Indiana's scheme. So that is an abridgment of the right to vote on account of age under any reasonable definition of the term. Let me ask you this question. What's the legal significance, if any, in your view, the fact that Indiana's governor has lifted the prior stay-at-home order and the state, as I understand it, has progressed to reopening Stage 5? I think that there's no significance, Your Honor. If you look at the public health emergency that was put in place, universal no-excuse mail-in voting for the primary, what they based that decision on in March was the public health emergency, which is still declared and which the governor extended at the same time that he issued his order a week ago, moving Indiana to what he called a new normal under Phase 5. The public health emergency is still with us, and I'm reading now from Executive Order 20-44, which is the renewal of that emergency, which says that the virus has now spread to every county throughout Indiana, with over 114,000 confirmed cases. The virus is still prevalent, new confirmed cases daily, and tragically continued deaths. And then it recognizes that emergency conditions continue to exist in the state, requiring the continuation of the emergency declaration. The other thing I would say is that the fact that Indiana has progressed to Stage 5 now is, of course, no guarantee that COVID will be under control when voters go to the polls in November. We've already seen in some states, including states in the Midwest, positivity rates and other indicators turn in the wrong direction. Indiana itself, unfortunately, has seen high numbers of positive tests the last few days. I looked this morning on the state's COVID dashboard, which gets updated daily, and I think it was around 900 people who were tested positive. So I think it's time to decide whether they feel comfortable going to the polls to cast a ballot, or whether they need to seek alternative ways to vote in the general election, have to assume that COVID will be here in November. Even as we even are existing order, the state of emergency will expire on November 1st, two days before the election. And of course, by that point, the time for applying for absentee ballots will have long passed. So I don't... How does this differ from a blizzard or a snowstorm which covers the state? I'm sorry, I just had a little trouble hearing you. How does this differ from a blizzard or a snowstorm which may cover the state on election day? I think there's a few differences. One is that, as I said, the defendants themselves recognize that this was such a significant and unprecedented burden that it required modification to the state's election procedures. The second reason is that this is foreseeable in a way that a blizzard or snowstorm is not. We know. We knew back in March that COVID was going to be a significant issue in the general election. We knew in June when the primary was conducted. We know now. And there is an opportunity for the state to make reasonable accommodations which will permit all Indiana voters, not just those 65 and older, to exercise the most basic right that they have in a democracy. So I think that is the fundamental difference. This is really just unprecedented and nothing like this has happened in American history for at least the last hundred years. The defendants on the 26th Amendment claim returning now to the as-applied claim, I don't understand them to really dispute that there are significant burdens based on the ability to vote. Rather, they make two moves under the 26th Amendment. One is to say that the 26th Amendment should be interpreted only to lower the voting age from 21 to 18. As we've explained in our reply group, that's just, we think, not a tenable interpretation of the plain text of that amendment. The 26th Amendment is written very broadly. And it's written expressly in the model of the 15th and the 19th and the 24th Amendments. All voting amendments which create general rules that apply to all people who fall within their terms. So the defendants are absolutely correct that the impetus for the 26th Amendment was the Supreme Court's decision in Oregon v. Mitchell which struck down Congress's attempt to lower the voting age by statute. That may be why the amendment was passed, and that may be why many of the people framed and ratified the amendment. That may have been the expected application of the amendment that was most immediately before the framers and the ratifiers. But as we explained, citing the Rice v. Caetano case which arose under the 15th Amendment, the force of the 26th Amendment is not limited to the evils or the mischiefs that drove its enactment. Did you make an as-applied argument with respect to the 26th Amendment in the District Court? We did, Your Honor. If you look at paragraph 94 of the amended complaint, which is docket number 6 below, there's a paragraph explaining that even though the 26th Amendment, we think, we still think today, there's a facial violation of that amendment. It's especially apparent when the restriction that Indiana has on absentee voting for folks under 65 is applied in the pandemic. That's, I think, how the defendants understood it in their opposition papers in the District Court. They mischaracterized or described our 26th Amendment claim only as an as-applied claim, which it's not, but it certainly at least includes an as-applied claim. And then we've consistently argued both an as-applied and facial challenge in this court. The other thing, I guess I would say, Your Honor, is I think we pled it. I think it was clear everybody understood what kind of claim we were bringing. But ordinarily, plaintiffs are not required to plead legal theories. They're just required to plead facts and the legal theories that emerge in the course of litigation. So given the history that I just referred to, I think everybody was on the same page. We are bringing an as-applied challenge. And I think, of course, it's clear that this lawsuit was what the emergence of this pandemic in March and April. And so I think that provides additional context as well. Mr. Glickstein, can I ask you a question on your 26th Amendment argument that's on my mind with it? It goes to the remedy point. There's an exchange back and forth in the briefs. I'm sure Mr. Fisher will address it, where you're arguing for a so-called leveling-up remedy and the state says that the remedy in the first instance should belong to us and we would level down. I'd like to hear what your reaction is to that, and I think I've got a follow-up question for you. Sure. My reaction, and this, I guess, goes back to Judge Ripple's question about the pleadings, is from the very beginning, we have said that we want a leveling-up remedy. And the state never hinted that it thought that the appropriate course, let alone the course that's mandated under applicable law, is leveling down. I think there are several ways in which the court can avoid addressing this question. The most prominent is, most significant, is the fact that we're here on a preliminary injunction. And we're here seeking a preliminary remedy which will apply for November's general election, but does not require the court to craft an injunction that will stand for all time. And especially in light of the cases that the defendants cite, cases like Purcell that talk about the importance of avoiding confusion, I think it's clear that the least confusing best remedy in this preliminary posture is to expand the right to all voters. Even if the court wants to, I think, inquire more deeply into this question. Even the cases that the defendants cite, talking about leveling up and leveling down, recognize that there's a presumption of expansion in favor of nullification of rights. And there are certainly unusual circumstances where it might be necessary to level down, because it would create some kind of unthinkable outcome that the legislature could never have intended. And this is where I wonder whether the claim just bleeds into the 14th Amendment a little bit. It seems like, in some ways, with the remedy around the 26th Amendment, that the question is who decides? And it seems like the state has a pretty decent argument, in my view, given the authority conferred under Article I, that we should have a crack at the remedy in the first instance. And we're saying we'd prefer to level down. And if that's the case, then it seems to me that you have to argue — maybe you are — that the sheer force of the 26th Amendment in some other way, even when the age barrier is lifted, somehow confers this right to mail-in voting. I think that's a harder lift for you. And at that point in time, I wonder whether you're really talking about if the state is right on the leveling down, leaning on the 14th Amendment almost entirely. And one of the reasons I say that is Purcell is on my mind. If I'm not mistaken, people in Indiana have started to mail-in votes. And if they're talking about a leveling-down remedy, it sure seems that there's a real risk for chaos and confusion. Well, I agree with you, Your Honor, that there would be much less confusion in a leveling-up remedy than a leveling-down remedy, which is why I think it's important that we have a structure where the remedy that the court crafts is as much about its exercise of judgment and balancing of the equities as it is the legal merits of the claim leveling-up is appropriate. I also — I mean, we think we have a perfectly valid, straightforward 26th Amendment claim. I'll move quickly to the 14th Amendment claim. But I first want to address what you said about Purcell, which is I really — the state says that there's going to be confusion here. But I don't see how that's the case where what we are seeking is exactly the regime that the state put in place for the primary. And the Supreme Court said recently in the Common Cause Rhode Island case that when the status quo is that a rule was not enforced in the previous election, in that case, signature requirement — witness signature requirement on absentee ballots — in our case, a requirement that voters under 65 need one of these excuses, the risk of voter confusion is far less. And so it seems to me it's a very simple, administrable rule. If you were permitted to request an absentee ballot in the primary, you're permitted to do it now, and I think the risk of confusion is low. Moving to the Fourth Amendment claim, which Judge Scudder, you referenced, I think there, too, there's not really much disagreement between the parties. The defendants don't dispute — I don't understand them to dispute — that there's a significant burden placed on the exercise of the right to vote by COVID pandemic. And again, courts have recognized this. The First Circuit in the Common Cause case that I just referenced said it's a significant and unusual burden to make someone risk their life to cast a vote. So the question under Anderson's verdict, which is the test that this court has held applies to all Fourteenth Amendment claims, is whether the state can articulate specific interests that make it the plaintiff's exercise of the right to vote in this context. And the state refers to three types of interests, and I don't think any of them holds water. One is a fraud interest, a certain interest in combating fraud, but there is no evidence, none, that there was increased fraud in the primary or that expanding absentee balloting to the additional categories of voters that plaintiffs are seeking would increase the risk of fraud. And Indiana already has statutes and other mechanisms to deter fraud. The second thing they say is that there are some administrative problems and ballots arrived late. That's something the state could address by extending the time for mail-in ballots to arrive. But it's also not a reason to take away the choice from voters to cast a ballot by mail if they choose. The last interest that the state mentions is the fact that they had to expend resources and money to get ballots out in the primary. And I think that when you weigh that interest against the interest in people being able to vote safely during a pandemic, there's just no comparison there. And these kinds of administrative financial burdens on the state just aren't as a matter of law sufficient to significantly burden voters' rights. I see that I'm a little bit over my time, I believe. You've got four and a half minutes left. Four and a half of my total time? I'll have to ask the clerk. I'm not sure. I haven't been using that, too. I don't know. What time, how much time does counsel have left? Yeah, it looks like you've got about four and a half minutes of your total time left. Okay, so I'll reserve the remainder for rebuttal. Thank you. Thank you, Judge Caney, and may it please the court. Judge Scudder, cutting right to your question about the relationship of the leveling up and leveling down and Purcell. I think Purcell is very much concerned about exactly this sort of situation, where you've got a question perhaps about what the law requires, but there is a perhaps challenging question over what the proper remedy is. In here, the way this statute is written, which is to set up a system where everybody, generally speaking, goes to vote in person at the polling place on election day and then creates exceptions for that, one of which is for voters over 65. I think that the Morales and Tana case tells us you delete, you declare invalid the exception, which leaves only the general rule in place. Now, we have started voting. I think you're exactly right. Bail-in voting has already begun. It's an exception for the elderly, I believe, isn't it, which is defined in another provision as people over 65. Precisely. So it's clear on the face of the statute that the intent is to protect the elderly. That's right. Exactly right, Your Honor. And, you know, if you announce all of a sudden an exception relating to whether the elderly can undertake bail-in voting, that is going to cause all kinds of problem and confusion. Better, I think, if there is a serious question on the 26th Amendment, to let that be sorted out on summary judgment, let it go through the normal litigation process, so that any remedy, no matter what the courts ultimately determine the remedy to be, and rest assured, we think it is to eliminate the bail-in option, that can be implemented in due course, not on the eve of an election, not after voting has already begun, which is exactly the problem that Purcell is worried about. So I don't think that that cuts in favor of what the plaintiffs are seeking here. Now, I do want to remind the Court, of course, that on the 26th Amendment claim, the Fifth Circuit just recently decided that that was not a valid claim, that they rejected this exact theory that the plaintiffs are advancing here. Among other things, they cited the McDonald case and said there is no right to vote absentee. Part of the core right to vote is not a right to possess or cast an absentee ballot. As a consequence, just because we have this allowance for the elderly to safeguard their ability to vote in a particular way, that doesn't mean that that's a burden or infringement or an abridgment, I guess, is the text I'm looking for on the right to vote of people who are between 18 and 65. And so I think that there's no distinction between the two cases in regard to that logic, and I think we urge the Court to follow what the Fifth Circuit did on this question. I think... Mr. Fisher, would you mind if I ask you just a couple of practical questions, just to confirm or get the benefit of your understanding of how the absentee ballot applications are working? Suppose you have an individual under 65 that is immunocompromised. Could they check the box on the state form that indicates that they have an illness? No. In fact, in our view, the illness exception, I think by text, requires you to be confined to your home. There is a broader exception for disability, but we don't read that to include immunocompromised status without something more. So if a doctor said to a registered voter under 65, because of the situation with your immune system, you really need to avoid going out, including on voting day. They couldn't, in good faith, check that box that they have an illness and then sign it and get an absentee ballot? I think that may be different. If the doctor is saying you need to be confined to your home, and that is a consequence of something like that, that may be different, I think. But we don't have any of the plaintiffs in this case that describe their situation that way. Could an individual apply to the Commission on an individual basis and say, I am immunocompromised. My doctor says under these particular situations, I can't go out. I would like an exception. I want it like mail-in ballot. I don't think that there is capacity for local boards to create their own exceptions. The Commission, the State Commission. Even the State Commission. The State Commission could, yes, absolutely. In fact, the rationale for the primary order, which permitted all mail-in voting, was to make an emergency determination for all voters. And I think that if an individual voter made that kind of application, surely that's within their authority. That would seem to be in black and white in the statute, that there's a safety valve at the state level where an individual can go and say, look, I've got a real problem here specific to me. I want a vote. Can you give me an exception for an absentee ballot? And the Commission can decide that matter. I agree with that 100%, Your Honor. This dialogue is important to me with Judge Ripple. So, Mr. Fisher, would that apply in your judgment if hypothetically I was a physician and I said I treat cancer patients or AIDS patients and I've got to be quadruply careful so I'm going to write a letter to the Commission, explain my situation and conclude the letter by requesting permission to vote by mail? Well, I think the statutory allowance that I'm familiar with speaks in terms of whether an emergency permits this. And I think if we're talking about a pandemic-related concern that is temporary, that pushes a sense of urgency on the situation, I think that's what I understand Judge Ripple to be talking about. And my hypothetical is I'm trying to cut it out of the same cloth, that it's not general, that it's 100% pandemic-related and trying to be careful for the cancer patients that I treat. I think that upon a proper showing, that might be permissible. But that might be something the Commission could do. Now, I don't mean to suggest that they necessarily would. I suggest that the process is there, the procedure is there. It seems to me they would have the capability to work with the word emergency in that circumstance to come up with a solution if they thought that was appropriate. That's the thing about the Commission, they have their own discretion, they have their own way of addressing these issues. Well, in any event, I think we have advanced an interpretation of the 26th Amendment consistent with what the Fifth Circuit said, and we urge the Court to adhere to that. With respect to Anderson Burdick, I understand my friend to be saying, well, we don't dispute that the pandemic is a burden on voting in person at the polls. Well, let's be clear about the pandemic, of course. The pandemic is a burden on life. I mean, it affects everything. Now, there are many burdens on life, many burdens on life that make it very difficult, if not impossible, for some people to get to the polls every election. But the Supreme Court and this Court have said that's not enough under Anderson Burdick to rule a particular regulation out of bounds or to confer a particular type of voting method on an individual voter. That's just the nature of what we deal with when we deal with elections. We have to have structure. States have to have flexibility to adopt a mix of rules that permit access, but also balance that against the need for security. And sometimes, inevitably, somebody's going to be unable to vote as a result. That's just the way it is. And the fact that the Commission, in the midst of the early stages of the pandemic and right on the heels of the governor's stay-at-home order, not only pushed out the deadline for the primary, but extended on its emergency authority the ability for everybody to cast a mail-in ballot, doesn't bind it to do the same thing now. And I don't think there's anybody in Indiana that, at this moment, thinks that mail-in voting is available to everybody. So it would induce a change of status quo and potentially confusion to issue an injunction that suddenly opens that up. Everybody understood that that order was for that election. And indeed, I think my friend said that everybody understood it before the primary, that there were burdens, generally, about the pandemic that we had to deal with. But of course, they didn't even seek the preliminary injunction until after the primary. And as a consequence, on this timeline, here we are at this late date, after voting has already begun, really within a month of the election day, that they want to expand the right to mail-in voting to everybody. And I think Purcell just tells us that that's not an appropriate way to litigate voting claims. Mr. Fischer, Mr. Glickstein makes the point that, look, the state managed to handle this at the time of the primary just fine. In fact, did quite well with it. What can you say at a fairly high level of specificity as to the difficulty the state would have of implementing the same for the general election? Well, and I think to be clear, that much of the burden here would fall on... I guess, why couldn't you do it? Why couldn't you do it? I mean, there's still some time. Right. Well, of course, what we're talking about here, in part, is dealing with the volume. The volume of mail, the security for the ballots, the personnel required to process the ballots and to count them properly. And the declarations we have in the record from some of the county clerks attest to the extraordinary measures they had to undertake at the primary just to deal with the volume, the expense, the physical space necessary, the security that had to be hired, extra personnel. And I think it's important to understand that absentee ballots are not simply run through a machine when they come in. It's not something that I think you can deal with as efficiently as in-person voting in some respects. Because the process is there have to be absentee ballot counters present. There has to be the election board present. There has to be an opportunity to inspect the ballot and the application to make sure everything is as it should be. And so it does take time. And so if you have this massive volume of mail-in ballots, that's going to require more personnel and possibly push back the results, which generally are available election night. So I think there are very specific consequences that happen when you have this much mail-in voting. That's also, of course, not even to mention the risks that we incur on the front end. When more people have more access to mail-in voting, that opens up not just opportunities for fraud, but opportunities for coercion. And Indiana has had a mayoral election in the last couple of decades thrown out because of the fraud in the mail-in voting process. So I think there are good reasons for the legislature to have been skeptical. So I think there are very specific concerns that we've got. Your Honors, I think as I look at my notes, I think I've really touched on the points that I wanted to make. And if there are further questions, I'd be glad to try to answer them. But if not, I don't want to belabor the point unnecessarily. And I will let Mr. Glickstein return and give his rebuttal. Mr. Fisher, is the mayoral mail-in fraud concern, so those are the ones that are outlined in the Pavey v. Pastrick case that you all referenced? Yes, exactly. Where the whole election had to be I think part of the problem there was fraud with the handling of mail-in ballots, which gave rise to statutory amendments that restrict who may handle mail-in ballots. And that was, I think, a very difficult lesson for us to learn, that you have to be careful with those sorts of things. I mean, this court, of course, is no stranger to it. In Griffin v. Rupes, it recognized that when it comes to voter fraud, it's more likely to happen with the mail-in situation than it is any other situation. I don't believe there are any other questions, Mr. Fisher. Thank you. Okay, thank you very much. Mr. Glickstein? Thank you, Your Honor. I have five or six points I'd like to make, although if the court wants to take me elsewhere, I'm happy to follow. The first concerns the McDonald case and the Fifth Circuit's interpretation of that case. It is not correct that the Fifth Circuit reads McDonald to foreclose the 26th Amendment claim for the reasons defendants say. A day after they submitted their response brief, the Fifth Circuit abrogated the decision that the motions panel issued, which is the crux of the argument the defendants are making here. Now, the Fifth Circuit, by a 2-1 vote, did reject the 25th Amendment. It's still based on its understanding of the word abridgment. We've explained at length in our reply brief why that is wrong as a matter of law, why it's contrary to this court's interpretation of the 15th Amendment in Section 2 of the VRA and must be reversed. And so I don't think that case is in control at all here. The second thing I would say about McDonald is that that was a case about denial of the right to vote. The court there said there was no evidence. First of all, it was an evidentiary holding. Secondly, it said there was no evidence that the inability to vote absentee needed to be proposed. That's not the standard under the 14th or the 16th Amendment under our 26th Amendment. The 26th Amendment talks about denial or abridgment and the 14th Amendment, as interpreted in Anderson's verdict, talks about a burden on the right to vote, not a bar on the right to vote. The second thing I'd like to talk about is the idea of this safety valve, this sort of individualized application to the commission. One problem is that the commission won't deal with these issues. They met only once after we filed our lawsuit and they said that they wanted to defer to the courts. They didn't want to make a determination about when voters could pass ballots in these emergency circumstances. Is there a judicial remedy in the state courts for that kind of an attitude or action? There might be, but as a practical matter, Judge Ripple, there's not a remedy before the election. I mean, I think the election is now 33 days away. So I also think that it raises serious equal protection concerns if you have one-off grants of emergency absentee voting where similarly situated voters who don't understand that there's this new process or don't apply are denied the right. The next point that I would talk about... You couldn't get any kind of injunctive relief from a state court. I'm sorry, say that again. You could not get any kind of injunctive relief from a state court. I don't believe that that's practical in the time remaining before the election. And of course, this court has... I mean, the federal constitution is binding on the states too, and I think there's no principle that if the federal constitution is being violated, one has to exhaust state remedies before coming to court for a remedy. The next thing I would say is about the leveling up, leveling down remedy, a point that I forgot to make in my opening. It really is an equitable remedy, and the state should not be allowed to benefit from the confusion that it engendered when it first permitted everybody to vote absentee in the primary, saying that that was a disability, and then reversed course for the general election, and on the eve of the argument, raised for the first time this idea that leveling down was the only appropriate response. I do want to say a few things about the administrative problems in the primary because of the volume of mail-in ballots. The reality is that there were many mail-in ballots requested in the primary and sent back in the primary because everybody wanted to vote by mail. There's no showing that there was a flood of mail-in ballots because of the expansion that the court ordered under the emergency authority. Obviously, some people applied for mail-in ballots who were under 65, but many voters who might have voted in person in a normal election cast their ballots by mail, and are likely to do so in the general election. So I think you're going to see increased mail-in balloting no matter what, and there's not really a unique harm here from allowing additional voter choice to access the ballot. Council, haven't letters already gone out from the various parties indicating who's eligible to vote by mail and who's not? The application period is open, and the rules for applying for a mail-in ballot are public. Letters went out by the Republicans and the Democrats, I think, which also indicate those who can vote by mail. Those were sent by the political parties to vote for their supporters. Well, that's right, and we would just ask as part of the injunction that the commission take all steps necessary, including declaring that... What's the confusion aspect I'm speaking of? I see my time is up, but if I could answer your question, Your Honor. I don't think that there is a prospect of confusion, because there would be an order from the IEC that said that just as we determined in the primary, we now want to expand the category of disability to include anybody who feels that they can't be in proximity to another person because of a risk to health or the fact that you're expanding the category doesn't take rights away from anybody, and I don't think it's likely to cause confusion. We'd ask the court to reverse the decision below and hold the plaintiff's satisfaction requirements for a preliminary injunction. Thank you. Thank you, Mr. Dickson. Thanks to both counsel, and the case will be taken under advisement.